Good morning, and thank you, Your Honor. May it please the Court, my name is James Green, and I'm appearing on behalf of the plaintiffs of Pelham's in this case, who for ease of reference, I'll refer to as the contractors. I would like to reserve three minutes of my time for rebuttal. As I'm sure you've learned from the party's briefs, this is a rather complex case that has spanned roughly eight years. The controversy revolves around the Matinee project, which was supposed to be a multi-billion dollar solar power plant construction project based in Arizona, Nevada, and California. As it turned out, the project was nothing more than a fraudulent scheme. Appellees in this case are two of Matinee's CEOs, Mr. Kim, who was the CEO of Matinee, and Mr. Chung, who was the CEO of Asia Pacific Matinee Energy. The contractors argue that in addition to the default of defendants in this case, both Mr. Kim and Mr. Chung should be held liable for their roles in this fraudulent scheme as well. The contractors are pursuing two causes of action against Appellees Kim and Chung, civil conspiracy and piercing the corporate veil. We believe the district court erred in granting summary judgment in favor of Appellees Kim and Chung, and for the reasons stated in our brief, and for those that I'll explain today, the decision should be reversed and remanded for trial. The first point I would like to make is that the district court erred by improperly weighing the plaintiff's evidence. This is a fact-intensive case that involves a fraudulent scheme that led to a situation where indisputably, the contractors were fraudulently induced to hand over millions of dollars, and once the gig was up, the defendants started pointing fingers at each other to avoid blame. Appellees Kim and Chung, who all accounts were both aided and highly sophisticated businessmen, expect everyone to believe that these high-level CEOs were completely in the dark about a scheme being perpetrated by a third-party individual whose name was Paul Jong. These high-level CEOs with unfettered access to business records, banking statements, corporate meetings, access to other individuals that were involved, including bankers, supposedly had their heads buried firmly in the sand, and were ultimately, as they claim, victimized by this third-party individual. Well, maybe, Mr. Green, if you could just focus in on the specific items of evidence that the district court pointed to that seem to support at least, I mean, maybe we can start with Mr. Kim, because your case, it seems like everyone agrees that if your case doesn't stand against him, it doesn't stand against the second defendant either. So maybe you could just address, rather than talking generalities, that well, given their positions, these folks must have known that a fraud was being perpetrated. Maybe you can focus on the more specific items of evidence the district court discussed that seem to support Mr. Kim. Examples of the evidence of culpability of Mr. Kim and Mr. Chung, we presented that the district court are laid out in table on pages 34 through 37 of appellant's opening brief. Of most importance are Kim's false claims that Matinee had $600 million in equity, that they were supposedly backed by this billionaire, a mysterious billionaire located in Boston, that the company had secured financing from Oregon, which, as it turns out... He said all of those things. And I think it's not really disputed that all those things were false. But the question is, what is the evidence that he knew that they were false? Well, Judge, one thing, and thank you for your question. One thing that I would like to point out is that his state of mind at the time and the statements that he made are a question for a jury that should be raised to a jury. In addition to that, there is one particular individual that we would like to have testify at the trial, Mr. Paul Jong, who was the fall guy for this entire incident and somebody that we think will point to Mr. Kim and Mr. Chung as equally being culpable in this case. However, we do believe that when he testifies, he's likely to say that he was not alone in this fraudulent scheme and that, in fact, he had been involved with Mr. Kim and that Mr. Kim and Mr. Chung knew about it. But why wasn't he deposed? I mean, it seems like it was your obligation to try to do whatever discovery was needed to have the evidence of knowledge that you need to show the elements to show that you can get to a jury. And I think the issue here is that there seems to be a gap on the knowledge of these two defendants, the knowledge about the falsity. Yeah, thank you, Judge. And to answer your question, unfortunately, that was a strategic decision that I believe was made by Appellant's counsel before I was involved. Unfortunately, the attorney is incapacitated. He cannot comment. We don't know what his thinking behind that was. I assume that he made the decision based on the fact that they already knew that Mr. Jong, they had sufficient evidence to prove that Mr. Jong was culpable and, you know, there was sufficient evidence in the case against him and that also they intended to pursue this matter in trial and intend to put him on stand. But you have to be able to get a summary judgment. And if Jong is the person who would have had knowledge about these two other defendants' knowledge and no one talked to Jong about it, then you're left with a lack of evidence on that point, aren't you? Well, again, Judge, you know, my I can't answer as to why a prior counsel did not depose Mr. Jong. But given that he didn't, what is your evidence of knowledge that these two defendants knew and also had agreements with the other defendants? There are two things you need to show. What are the evidence of those things that you can point us to to show why you should be able to get past summary judgment? Well, I think these are two high-level CEOs of this company. Now, defendants like to point to the fact that these are claimed that these are just kind of titles that they were given, that they were meaningless titles, that they didn't carry any weight. However, these were the CEOs of the company and they expect a jury to believe that they had no idea, that they took no effort whatsoever to review banking statements. They never investigated the company whatsoever. They never looked into this allegation that there was $600 million in a bank account. And I think all of that would lead a reasonable person to conclude that they knew about it, that they were involved in it. Because any CEO would investigate those claims as the CEO of the company. That's what CEOs are responsible for making sure that they, you know, are carrying out their role as the chief executive. This is the impression I came away with in the record. Your argument, it seems to me, is just simply they had to know because by virtue of their position. And then when it comes to specifics, we really don't have anything. We just think it's enough to get to the jury that we can say that, my goodness, given that Mr. Kim was the CEO, he must have known. Any fool would have known and that's all we need to show to get past summary judgment. I just don't hear you saying anything beyond that that would provide a basis for reversing the district court's order here. Yeah, I mean, and Judge, and I think that those are fair points. I mean, the fact that they were the CEOs of the company, any reasonable CEO would have done their due diligence and verify these facts. And so I have a hard time believing, and I think a jury would have a hard time believing as well, that they just had their heads buried in the sand. They had no idea what was going on behind the scenes. But Mr. Kim, this is what I was asking earlier, Mr. Kim produced specific items of evidence that supported his lack of knowledge. And it seems like you don't really dispute them. I'm thinking of the, I can't remember the investment bank that, you know, went to these meetings at. He obviously relied upon the statements of Mr. Young about the billionaire investor. I understand that he himself loaned money to this enterprise and lost it. Again, all of those things are completely consistent with his version of the story. And so you'd have to produce something to counteract that, that would create a, you know, the ability for a reasonable jury to find in your favor. And I just, I'm seeing an absence of anything on your and then I look on his side and I see a lot of evidence that would support his, his position that he didn't know at the time. Well, judge, and also I'd like to point out the fact that, you know, Mr. I don't think it's disputed in this case that Mr. Kim made numerous false representations about the status of the company. You know, when he's, when he's telling these other people and using this information that he has to convince people to give money to this company, when he's making these false representations, I don't see how you could look at this evidence and come away thinking anything other than he knew that what he was saying wasn't true. And why else would he make these series of false, false statements if he didn't know what was happening behind the scenes was, was, was this fraudulent scheme that was ongoing and being carried out by among others, Mr. John. And, and the other thing, you know, the judge in the district court case also looked at all of the individual pieces of evidence. And one thing that I would like to point out as well is, yeah, if you attack each individual piece of evidence and you look at each piece of evidence individually, it's not as strong, but when you look at the whole thing, the entire picture of all of the things that happened over this course of a year and a half to two years, you can't come away with anything other than thinking that Mr. Kim and Mr. Chung knew what was going on. They were involved in this fraudulent scheme and therefore should be held culpable for their roles in this scheme as well. And, and I think the, you know, again, going back to Mr. Kim statements, Mr. Kim made his own statements. These were self-serving statements that he made to the court that involved his state of mind and state of mind is a question that should be left for the jury. And the jury should be able to analyze those assess his credibility, assess the credibility of the other witnesses and should be able to make a decision in the case. And rather than allowing this case to proceed to trial on the merits, the district court instead decided that there was insufficient evidence to move forward. We believe that was an error. And, uh, you know, for those reasons, I would ask the court to remand the case, uh, district court for jury trial. And I would like to reserve the balance of my time for rebuttal. Thank you. Okay. Very good. Thank you. Let's hear from counsel for the appellees. A good morning, your honor, uh, Eric Nishizawa on behalf of, uh, Pelly, uh, S chin, Kim, uh, Mr. Jacobs and I have agreed to divide the 20 minutes for the, uh, Pelly's, uh, 13 minutes for me and seven minutes for him. However, if I do not use my full 13 minutes, I will yield the balance to Mr. Jacobs. Um, I think the court has focused on Mr. Tim's, uh, argument here, and that is that Mr. Rule 56 work, no proof on a number of, of elements of the plaintiff's causes of action and plaintiffs provided no evidence to controvert such. And therefore the district court's ruling on the summary judgment motion by, uh, Mr. Kim should be affirmed. Uh, there is no evidence to controvert Mr. Kim's, uh, very specific evidence as to the, his knowledge regarding, uh, issues of financing, um, and the other issues that he supposedly, uh, make representations, uh, to plaintiffs representatives of that. Um, because there was no, no, no evidence to establish his knowledge of any falsity, this court cannot, um, find, or this court can rule on, on a statement, uh, on the state of mind. Can I ask you about that? Because certainly there was a piece of evidence that I wondered about, um, which was the dinner conversation that Choi overheard apparently in which Kim was, as I understand it at the dinner. And there was a discussion of dividing up the consulting fees and also a discussion about Kim being a figurehead. How is that not evidence of Kim's knowledge? Well, the, the problem with that, your honor, is if you look at the, the deposition testimony, if you go further from just what the plaintiff cited in cross-examination, Mr. Choi admitted that he could not see who was actually making those statements, who was speaking them because he was behind a closed door. He was, he was outside the door. That's why he couldn't see it. He was behind a closed door actually. Right. So outside a closed door, it was loud enough for him to hear it. How is that not a reasonable, doesn't that create a reasonable inference that Kim who was inside the room must've heard it? Well, but the, the thing is your honor, that's not a misrepresentation. Even if Mr. Kim heard it and there's no evidence to indicate that he heard it, um, that's, that doesn't mean that he assented to it or did anything with that information. But isn't it, I mean, so usually at a conversation that's loud enough to be heard outside the room, you might think people inside the room would hear it. And you might also think you wouldn't have such a conversation unless everyone inside the room was already in agreement. So I, I, I'm having trouble understanding what your interpretation of this event could be that wouldn't involve Kim hearing it. And that's because he already knew about it. Well, I, your honor, I think that that makes a number of assumptions that just aren't borne out by the, in the record. So what can you describe how to explain how this occurred? What, what would have explained this event? I, I was not present at the event. I just know from taking the deposition that Mr. Choi heard this from behind a closed door, uh, while he was walking there, he couldn't identify who was actually making, was actually speaking. He couldn't identify where everybody was, uh, was seated or he didn't identify where everybody was seated. So it could be that Mr. Kim was on one side of the room or table and these, the people who were speaking were closest to the, the, uh, closed door. They were speaking and they could hear, but it doesn't establish that anybody else, uh, could hear or, or participate in that conversation, including Mr. Kim. Uh, there's also no evidence of a, uh, there's no clear and to commit an unlawful act or for an unlawful purpose against the, the plaintiffs. There's also no evidence to controvert, uh, Mr. Kim's evidence on alter ego liability. And that is specifically, he is not, uh, he was not a shareholder of, uh, matinee energy, and he did not have the power, even though he was nominally the CEO to control or dominate matinee. Mr. Kim's declaration is very specific as to which powers he did not have. For example, he did not have access to the accounting books and records, did not have access to the corporate, uh, books and records, did not have access to the bank accounts of the corporation. Could you describe, was he a full time CEO? I, did he work, uh, every day, eight hours a day on this? No, he was not. He had the, he had the title and he was consulted. Like for example, as we point out in Mr. Kim's, uh, declaration and in the, uh, answering brief, Mr. Kim was not even brought into contract negotiations until the very end when he was asked by Paul Jong to sign. Um, the J.D. Song, uh, declaration, which is, uh, part of our, uh, the motions, uh, the motions moving papers, uh, indicates that there were at least 10 drafts of the, the master agreement that just Solar's, uh, signed. Mr. Mr. Kim never saw any of those drafts. Never. I think he was the CEO for about three years. What did he do? Well, he was, he spoke, uh, and was consulted on strategic issues, but with regard to day-to-day operations and, and, um, as I point out, things like negotiating contracts, he was not brought in and was not active in that. So how could he consult on strategic issues? I don't really understand what that means if he doesn't know what's going on. Well, in terms of, uh, of broad based issues, like for example, with regard to, uh, the, the financing, like when he found out that, uh, Mr. Jong had signed the, uh, inserted his memorandum one by saying, wait a second, we, they won't have any skin in the game. And we're, what are, where are you going to get these letters of credit? Paul Jong told him that he had three or four banks ready to, to provide that letter of credit financing. So it's, it's perhaps, uh, the way to look at it is it's a 30,000 foot level as opposed to a day-to-day sort of, uh, level of activity. Does that answer your honor's question? I guess so. I just, I mean, I think your opponent's argument, which is somewhat intuitive is how is it plausible that he was the CEO for three years and really had no idea what was going on? Well, uh, the thing is that, uh, it's, it's certainly very possible for someone to be that we provide provides very specific, uh, evidence of what he was not doing and not able to do. So regardless of the fact that maybe in general, a person would have a, a question as to what a CEO should or shouldn't do, or should or should not know in this particular case, Mr. Kim has provided very specific evidence of what he did not know and what he could not do. And there was absolutely no evidence to controvert that. The evidence that, that the appellant points to is things like, gee, it would be nice, or I agree with something that doesn't establish any sort of level of power or any level of government. Is there any responsibility though, on an individual's part to not call themselves the CEO and put themselves out as the CEO asking for money and doing things if they don't actually know what's going on? Well, I don't know. Uh, I don't know about that. Your honor, the, that issue as far as I could see is not briefed in this, but the, the, if we go back and look at the actual, uh, the actual evidence that is before the court and what could and could not be done by Mr. Kim, it's very specific that he did not have any knowledge of any falsity. And that is what it, the appellants must show. There's... Could you address the, the email that Mr. Kim sent to Mr. Chung where, uh, he said, you know, now no one is going to question, uh, luck's change. Is that, I know your other side points to that. And it sounds like the sort of thing you might say if, you know, what you're doing was not entirely on the up and up. I, I'm not, I'm not sure which... Pardon me, what was the page number again, your honor? Page, page 88. In this way, no one will question luck's change. That's at the end of the second paragraph of the email. Well, your honor, I think that that speaks to credibility because it, if in the first sentence, it talks about, um, another brilliant idea that Paul came up with, uh, that's adding credibility to matinee by putting Mr. Panos as the, um, as a chairman of matinee. But that certainly doesn't, that's, that's certainly not indicative of anything, uh, of bad faith or, uh, any knowledge of falsity, your honor. If he, if he agrees that Mr. Panos is a, is the right man for the job, I think that he's just saying, I think he's the right man for the job. But I mean, I suppose that's one way to read it, but, uh, I mean, on summary judgment, we have to draw, you know, permissible inferences in, uh, the non-moving party's favor, right? And you could read that as the, the, the language of someone who was concerned about his venture being questioned, um, you know, is the sort of thing that you would say, um, if, if you thought there was some reason to question your venture because it was fraudulent, right? Well, I disagree with you, your honor, because on summary judgment, it isn't just any, the standard isn't just any evidence. It has to be evidence on which a reasonable juror could, could find for the plaintiffs. I, while I agree that that it's certainly possible as your honor has done to possibly see something nefarious in that, it's certainly, I mean, somebody has, because your honor has certainly done that. It's, I don't think that that is the only reading that, that is. And quite frankly, I don't agree that that is the most likely reading from, from that either. Uh, I think the rest of it is quite, um, is quite clear in, in establishing that what Mr. Kim meant by that was that the, the company by putting the right people in makes it a more credible company. And that's, that's very important to a company that's starting out. This is not an A after all is a startup. So credibility is important and he's agreeing with, uh, the appointment of Mr. Panos. It doesn't say that he has control over this issue. It doesn't say that he is the one putting Mr. Panos and it's, it's merely agreeing with it. And I think that's the problem with the other items that the plaintiff has pointed to. There was another email where they pointed to with, with regard to the selection of, of contractors, or I think they refer to them as builders in the reply brief. That's just saying simply expressing, gee, I would like to do something. None of this indicates actual control, a desire or a wish that's not going to, that's not exercising some sort of, uh, um, dominance or control. Okay. That's probably a good place to stop. Yeah, I will, I will defer to Mr. Jacobs now or yield to Mr. Jacobs now. Very good. Good morning, Your Honor. Sorry to switch rooms. There was a sudden jackhammer in the street, Andrew Jacobs for Tong Chung, um, for the remainder of our time here. I'd like, if I could, to discuss a few Chung specific things and also address the questions that Your Honors have raised to this point, if I could. Um, but as far as Chung specific matters, there's one that really both unique bases to excuse Mr. Chung from the suit were really underscored by our, our, our friend's argument. Um, first, as far as the intra-corporate, uh, conspiracy doctrine, everybody agrees that the law is that a company can't, uh, officers can't conspire separately with the company. They have to be stepping out on their own and essentially engaging in ultra-virus conduct or doing something that is specifically directed toward themselves. And in the very small amount of argument advanced toward the point that that immunity would not apply in their reply brief, they basically point to their second amended complaint and said, we shifted the burden by alleging that they were doing selfish things. That, that doesn't really work. They have a single email they point to, which is excerpted in the text. And it's an email, like many of their attempts at proof that sort of swirl around, hey, isn't it intuitive bad stuff is going on. And the email there is one from Kim to Chung. And if you look back the way they cited it, which is interesting at 2ER page 142, they're actually just citing their own brief and not the brief. They say that Mr. Kim here informs Mr. Chung of his thought that he, Mr. Kim thought that they could work 100 megawatts in an arrangement. There's nothing there. That's an act by Mr. Chung. There's no assent or response by Mr. Chung. And I think we really need to hold this conspiracy to its proofs. I mean, the conspiracy isn't just some airy vapid conspiracy. It's a very specific conspiracy to induce a bunch of equally sophisticated corporate actors to fraudulently give money before they're supposed to. And this email where Kim says to Chung, hey, there may be an opportunity for megawatts over there, not only isn't an act of Chung of any sort, it isn't profiting Chung in any way. There's no evidence Chung took a step toward that. But most of all, it does not map to the conspiracy. There's nothing that's individually pro-Chung that's an act toward profiting from getting a million dollars prematurely from these sophisticated contractors. So really, intracorporate conspiracy doctrine really should bar this. They really have not made a demonstration. And I think that we did. And as far as alter ego goes, alter ego is a very clean basis here to excuse Chung in particular. When one looks at their brief, they have the table that our friend referred to and was arguing from and explaining facts that he thought would be of most interest to your honors. But all of his headings are about Kim. None of them are about Chung. And the headings even say John didn't control, Kim controlled. No one is saying in this brief, there's not even a shred of an argument toward alter ego status with Chung, who's on another continent, who's never really dealing with the other people, the contractors directly. There's not really a whiff of alter ego here. But I'd like to recur with a little bit of time here to Judge Miller to your question first, which is you addressed that email. And the email is really interesting. I've never been involved in a case where someone wanted to allege fraud, where the alleged fraudster is writing to someone else that we will honor our covenant by any means. That's a direct quote from the email. And he's referring to, we're going to get some steel or something at a cheaper price. And it really would be worth more. We're going to honor the contract. So this is an email, and it's a very detailed email about very specific plans about buying hundreds of thousands of tons of goods for use in a venture. Nothing about that remotely whiffs of fraud. And there's this, even though the steel's worth more than that, we're going to honor our contract, my fellow defendant, as it turns out. So I think that this email has an awful lot of waft that goes the other way. And I don't think a reasonable jury could found, giving our friend the benefit of what he said, which is you have to consider all the evidence. You know, we get it. He's right. But taking this as far as you can take it is, as my colleague, Mr. Nishizawa said, is all that's going on here is what goes on every day in America when a company's trying to establish its chops. You know, here Mr. Kim thinks he's in a real company. He's trying to buy hundreds of thousands of tons of steel from Greece or something like that. And it's normal. You know, when you have a business, you know, you try to get like an O'Melveny and Myers to represent you. You try to get people who can speak for you. Establishing your credibility is not a fact that leans toward the area of suspicion, though we understand in the aftermath of matinee blowing up and costing Mr. Kim $303,000 and injuring the contractors. We understand that it's easy with 20, 20 hindsight to say, well, this corporate attempt at polishing your bona fides. Well, you know, a reasonable jury could. I understand why that's his argument, but that's what companies do every day. And Mr. Kim was injured by that as were as were the contractors. So we think there are very good chunk specific reasons why in terms of inter-corporate conspiracy doctrine and in terms of alter ego, Mr. Chung in particular should be excused from this unfortunate story that this lawsuit is. I think at bottom, this is a very, very basic rule 68. And this is an instance where you have a classic no evidence motion that you see. And, you know, the rock was rolled up the hill under cell attacks and it's not coming back down and it's not coming back down for the reasons that has explained. And I would, I would point out, although it doesn't entirely judge Friedland go to the point of your question. When we look back at the testimony elicited about that meeting. And I think again, that testimony, it's a small thing. It's talking about someone being a figure head. Um, one can question how much the person was doing, uh, Tong Chong again, not there, which goes ahead and reinforces this alter ego point, which is that to the extent our friend has complaints about how the officers of the business were conducting their affairs. Those complaints do not go to something that made an individual benefit for Tong Chong. And they do not go to something that was an intracorporate conspiracy where he stood so apart from the objectives of the company that he was doing something to remunerate himself in the object of the conspiracy. And again, conspiracy, it's a prepositional phrase. It has to have an object conspiracy to do what it's a conspiracy to get extra millions out early, unfairly under the contract. None of that gets within three standard deviations of my client. Uh, we would argue that honors ought to affirm. Okay, thank you very much. Council. Thank you. You have some time for rebuttal. Thank you, Judge. The assertions by opposing council that the parties were not really involved in the operations of the business is simply not believable. The CEO, by definition, is the highest ranking member of an organization whose job is to make managerial decisions for the business. Uh, it was his position and the reliance upon Mr Kim answer Chung as CEO that contractors investing in the company and turning over millions of dollars, uh, to, you know, in reliance on their statements. Uh, the claim to matinee as a startup on Mr. Kim, uh, you know, Mr. Kim conveyed to the contractors that the business had been in operation since 2006, which also turned out to be another false statement made by Mr. Kim. The statements that Kim says John supposedly told him, uh, are, in our view, inadmissible hearsay and which we also expect Mr. John would dispute when he testifies at trial. Uh, finally, the specific acts, you know, as the judge asked earlier about the specific acts we rely on are restated in our opening brief, which are on pages 34 through 37 in a table and then also on pages 39 through 50. Um, as it relates to, you know, Mr. Jacobs, you know, mentioned these, uh, the defenses, um, you know, the court never, the district court never even reached those decisions. The court simply stated that it was insufficient evidence for the parties, the plaintiffs in this case, the appellants to pursue their claims. Um, so it never even looked at the intra corporate, uh, you know, conspiracy doctrine or whether or not there was a good faith, uh, defense for either of the defendants in this case. Um, one final point. And again, I said this earlier, but one final point is the district court and a rather lengthy order viewed each individual piece of evidence presented by the contractors in isolation. I think when you view all of the in perpetuating this fraud among the contractors. And again, we believe the testimony of Mr. Paul Jung, who was not opposed. Um, we believe at trial, he is most likely going to testify, uh, that he did not carry out this far alone, that he was not alone that Mr. Kim and Mr. Chung each knew about it and that they were also involved in financially benefited from this, uh, fraudulent activity. Thank you. Okay. Thanks to all counsel for your arguments in this case. The case just argued is submitted and we will now take a 10 minute recess before hearing the last case on the calendar.
judges: Watford, Friedland, Miller